UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

F.C. BLOXOM COMPANY,

        Plaintiff,

      v.

FIREMAN'S FUND INSURANCE
COMPANY,

        Defendant.

CASE NO. C10-1603RAJ

ORDER

## I. INTRODUCTION

This matter comes before the court on the motion of Defendant Fireman's Fund Insurance Company ("Fireman's Fund") for partial summary judgment (Dkt. # 53), a motion from Plaintiff F.C. Bloxom Company ("Bloxom") for partial summary judgment (Dkt. # 55), and Bloxom's motion for reconsideration of a prior order (Dkt. # 52). The parties requested oral argument, but the court finds argument unnecessary. For the reasons stated below, the court GRANTS the motion for reconsideration and GRANTS in part and DENIES in part each of the summary judgment motions. This order concludes with instructions to the parties to prepare for trial on May 14, 2012.

## II. MOTION FOR RECONSIDERATION

### A. Factual Background

The court first considered this insurance dispute in a pair of orders it issued on January 23, 2012. Fireman's Fund insured Bloxom's large shipment of walnuts and

ORDER – 1

hazelnuts to Venezuela in late 2008. For reasons not relevant to this dispute, Bloxom's Venezuelan buyer canceled the purchase before the nuts arrived in port. Bloxom made plans to return the nuts to its supplier in the United States. Bloxom's plans never bore fruit (or nuts). A series of snafus prevented Bloxom from re-shipping the nuts from Venezuela.

By May 2009, Bloxom began the process of filing a claim with Fireman's Fund. As the court will discuss in detail in its later analysis, the claims handling process was far from straightforward. For now, it suffices to note that Bloxom's first description of the loss for which it claimed insurance coverage came directly from William Bloxom, one of Bloxom's owners. Giving instructions on completing claim paperwork on June 1, 2009, he stated as follows:

> [U]nder section "DESCRIPTION OF ALLEGED LOSS OR DAMAGE" the box for "Not Specified" is checked. [T]his should be changed to "Other as Specified" with the addition of the following: "Dehydration and heat damage of fresh nuts remaining in unprotected dry container for 23 weeks."

Clark Decl. (Dkt. # 30) at 8. In other words, before this litigation began, Bloxom claimed that the nuts had spoiled.

Later, Bloxom changed its tune. It is not clear when its position changed, but Bloxom's counsel explained the new position in a previous submission to the court:

> To be clear, Bloxom is **not** seeking coverage for potential or actual physical damage to the nuts at issue, such as spoilage. It is instead seeking coverage for the <u>complete loss of those nuts</u> that occurred as a result of the fact that the Containers have become stranded in Venezuela. There is no causal relationship whatsoever between the complete loss of the Containers and any alleged issue of delay or inherent vice . . . .

Bloxom Opp'n (Dkt. # 43) at 17 (emphases in original).

## B. The Court's January 23 Ruling that the Fireman's Fund Policy Does Not Cover Bloxom's Loss As a Matter of Law

These disparate descriptions of Bloxom's loss were the focus of the first of the court's January 23 orders, which held that the Fireman's Fund policy (the "Policy") did not cover Bloxom's loss. The court explained that the Policy had an exclusion (the

ORDER – 2

"Delay Exclusion") that unequivocally barred coverage for any loss or damage caused by delay, even if that delay arises from a covered peril. Jan. 23, 2012 ord. (Dkt. # 50) at 6-7.

The court also held that Bloxom's alternative explanation for its loss lacked any evidentiary support. The court assumed for the sake of argument that the Policy would cover stranded goods. The court explained that the evidence "strongly suggested" that the nuts were at most temporarily stranded in Venezuela, and that Bloxom had abandoned its efforts to recover the nuts after they spoiled. Because the court found no evidence that the nuts had become truly "stranded," it found that a reasonable juror could only conclude that the actual cause of damage to the nuts was spoilage due to delay, which was precisely the description that Mr. Bloxom had given. The court thus found that the Delay Exclusion barred coverage for Bloxom's loss as a matter of law.

## C. Bloxom's Motion for Reconsideration

Bloxom urges the court to reconsider its coverage ruling. Bloxom carries a heavy burden:

> Motions for reconsideration are disfavored. The court will ordinarily deny such motions in the absence of a showing of manifest error in the prior ruling or a showing of new facts or legal authority which could not have been brought to its attention earlier with reasonable diligence.

Local Rules W.D. Wash. CR 7(h)(1).

Much of Bloxom's motion does not convince the court. Bloxom seizes on the court's discussion of its claim that the nuts became stranded in Venezuela. The court assumed, again solely for the purposes of the motion, that the Policy would cover the permanent "stranding" of the nuts. But, given Mr. Bloxom's admission that he sought coverage for nuts that had spoiled in the five months that they remained at port in Venezuela, and the lack of evidence that Bloxom attempted to reclaim the nuts after those five months, the court ruled that the cause of the damage was delay as a result of temporary "stranding." Bloxom cries foul because Fireman's Fund never raised a distinction between temporary and permanent "stranding." Bloxom misses the point.

ORDER – 3

As Fireman's Fund correctly pointed out, the initial burden to establish a covered loss falls on the insured. *Int'l Ultimate, Inc. v. St. Paul Fire & Marine Ins. Co.*, 87 P.3d 774, 784 (Wash. Ct. App. 2004). Fireman's Fund's motion focused on Bloxom's inability to prove any physical damage to the nuts, because no one had been able to inspect the nuts after they arrived in Venezuela. In response, Bloxom recognized (correctly) that the Policy did not require it to prove physical damage, and it instead claimed that it sought coverage "for the complete loss of those nuts that occurred as a result of the fact that the Containers have become stranded in Venezuela." In other words, Bloxom itself raised the issue of "stranding," acknowledging its burden to provide at least some evidence of a covered loss.[1] When the court distinguished between permanent and temporary stranding, it did not introduce a new issue. Instead, it contrasted Mr. Bloxom's admission that the nuts had spoiled with Bloxom's later claim that its "loss" was simply that the nuts became permanently stranded in Venezuela. The court found that Bloxom had offered no evidence to prove its claim for "stranding" as opposed to delay-induced spoilage and abandonment.

Bloxom contends that it produced "undisputed" evidence that the nuts were permanently stranded. Bloxom is mistaken. Instead, Bloxom submitted evidence that it did not succeed in extricating the nuts from Venezuela before it made an insurance claim in June 2009. It also showed that neither its representatives nor Fireman's Fund's inspector were able to access the nuts to inspect them in Venezuela. This evidence focused solely on the status of the nuts through June 2009, about the same time as Bloxom filed its insurance claim. When Bloxom filed its claim, it told Fireman's Fund that the nuts had spoiled. On this evidence, a finder of fact could conclude that Bloxom

---

[1] Bloxom complains that the court's conclusion that it sought coverage for delay-induced spoilage improperly saddled it with the burden of proving the inapplicability of a coverage exclusion. Bloxom ignores that it was Fireman's Fund who introduced Mr. Bloxom's admission of delay-induced damage. Def.'s Mot. (Dkt. # 29) at 7. Fireman's Fund met its burden to show that a jury could find that the Delay Exclusion applied. Bloxom's burden was merely to introduce evidence to show that the jury could reach the opposite conclusion.

ORDER – 4

abandoned its rotten nuts and reject Bloxom's contention that the nuts had become permanently stranded in Venezuela. Bloxom falls well short of providing "undisputed" evidence of permanent stranding as opposed to spoilage followed by abandonment.

Bloxom did, however, identify one conclusion in the court's order that is worthy of reconsideration. The court concluded that there was *no* evidence from which a jury could conclude that Bloxom suffered the permanent loss of its nuts because of stranding. Bloxom points to one piece of evidence to the contrary, from Mr. Bloxom's declaration:

> Despite [Bloxom's] best efforts over several months, we were not able to gain access to the Containers to complete these inspections and it became clear that the Containers were stranded in Venezuela as a result. Indeed, it is our understanding that no one on the ground in Venezuela (including Fireman's Fund's own inspector) was able to secure access to the Containers and that they remain stranded in Venezuela, a fact that I last verified in the spring of 2011.

W. Bloxom Decl. (Dkt. # 44), ¶ 6. Mr. Bloxom's statement is not inconsistent with the notion that Bloxom abandoned the nuts after they spoiled. He does not, for example, describe any efforts to extricate the nuts after June 2009. On the other hand, Mr. Bloxom's statement is also consistent with the notion that Bloxom continued to attempt to extricate the nuts until it determined it would never succeed in that mission. This is not strong evidence to support Bloxom's stranding claim, but it is at least some evidence. Fireman's Fund points out that when it deposed Mr. Bloxom, he repeatedly disavowed personal knowledge of his company's efforts to reclaim the nuts, and he repeatedly stated that Mr. Esteves was the employee who was directly involved. But Mr. Bloxom's deposition testimony does not rule out the possibility that he or others continued to attempt to reclaim the nuts, or that they learned that they had become permanently stranded. Similarly, although Mr. Esteves's deposition testimony focuses on Bloxom's efforts in the first half of 2009; it does not rule out the possibility that Bloxom made additional efforts, or that Bloxom learned that the nuts were permanently stranded. In addition, Bloxom declared in an interrogatory response that it "believes the [nuts] to be a

ORDER – 5

total loss without salvage value, as the [s]hipment remains stranded in Venezuela." Clark Decl. (Dkt. # 30) at 199. The court finds this evidence sufficient, just barely, to create a genuine issue of material fact over whether Bloxom suffered a loss via the permanent stranding of its nuts in Venezuela.[2]

**D.     Fireman's Fund's Other Coverage Defenses**

When the court ruled that Bloxom's loss fell within the Delay Exclusion as a matter of law, it had no need to rule on several other coverage defenses on which Fireman's Fund relied. It must address those defenses now.

First, it makes no difference what "stranding" means in the Policy. The court noted in its prior order that the parties disputed whether "stranding" meant the stranding of a ship, or whether the nuts themselves could be stranded independently of the ship. The court had no need to resolve the dispute then, and it has no need now. As the court previously held, Bloxom's nuts were "bagged goods" that the Policy insured against "all risks of physical loss or damage from any external cause," except those causes that the Policy specifically excluded. Jan. 23, 2012 ord. (Dkt. # 50) at 5-6 (citing Policy ¶ 32(K) and Cert. of Ins.).[3] If Bloxom permanently lost dominion over the shipment of nuts, it suffered a "physical loss" within the meaning of the Policy. It makes no difference whether Bloxom describes its loss of dominion as a "stranding," because there is no exclusion in the Policy that bars coverage for "stranding."[4]

---

[2] Bloxom also asserts that it has undisclosed additional evidence that supports its stranding claim. That assertion lends no support to its motion for reconsideration. Bloxom does not explain why it failed to offer that additional evidence in opposition to Fireman's Fund's original motion. It had ample incentive to do so, because it was attempting to provide evidence of the "complete loss" of the nuts as a result of their stranding.

[3] The court relies on the most legible version of the Policy in the record, citing its clauses by paragraph number. Clark Decl. (Dkt. # 30), pp. 124-175. Bloxom's certificates of insurance, which bind it to the Policy are two essentially identical one-page documents. Moore Decl. (Dkt. # 45), Ex. B.

[4] The Policy conditions the applicability of a small deductible on whether the loss is the result of "stranding." Cert. of Ins.; Policy ¶ 32(K). No party has asked the court to determine whether a deductible applies.

ORDER – 6

Second, the Policy's coverage did not expire 60 days after the nuts arrived in Venezuela. Fireman's Fund claims that the Policy incorporates the American Institute Cargo Clauses, including a "Duration of Risk" clause that ends coverage 60 days after the discharge of cargo from a ship. Even assuming Fireman's Fund is correct, it cannot overcome the language in the Policy that extends coverage to "Refused Shipments." Policy ¶ 18 ("Goods shipped by the Assured and refused by the consignee . . . are held covered until disposed of by the Assured by return to the port of shipment or to the intended alternate destination."). A similar clause appears in the same American Institute Cargo Clauses on which Fireman's Fund attempts to rely. Clark Decl. (Dkt. # 30) at 218 (extending coverage for "Shipments Returned or Refused").

Third, the Policy's exclusion for damage caused by "inherent vice" provides Fireman's Fund with no better defense than the Delay Exclusion. The court assumes, solely for purposes of this motion, that the nuts have suffered damage that falls within the "inherent vice" exclusion. That would matter only if Bloxom sought coverage for that damage. It does not. Instead it seeks coverage for its complete loss of physical dominion over the nuts. That loss does not fall within the "inherent vice" exclusion any more than it falls within the Delay Exclusion.

Fireman's Fund's final defense, that Bloxom did not timely file this suit, turns on factual disputes that the court cannot resolve on summary judgment. The Policy contains a suit limitation clause that requires an insured to sue Fireman's Fund within one year of a covered loss:

> No suit, action or proceeding for the recovery of any claim under this Policy shall be sustainable in any court of law or equity unless commenced within one (1) year from the time the loss occurred.

Policy ¶ 59. Bloxom brought this action in September 2010. Fireman's Fund reasons that Bloxom's loss, if any, occurred no later than when it filed its claim in June 2009. In

ORDER – 7

Fireman's Fund's view, the passage of at least 15 months between Bloxom's loss and this suit means that the suit is untimely.

Bloxom does not dispute that its suit came more than a year after its loss; it merely contends that equity excuses it from strict compliance with the suit limitation clause. It points to two facts. First, as the court will discuss in detail in Part III, *infra*, no one informed Bloxom that Fireman's Fund would not cover its claim until at least February 2010. Second, Fireman's Fund and Bloxom continued negotiations over the claim until at least July 2010. On July 12, 2010, an adjuster at Fireman's Fund wrote Bloxom's counsel requesting more information "to properly evaluate the claim and coverage" and asking that Bloxom "hold off on initiating litigation until we see if we can resolve this matter." Moore Decl. (Dkt. # 45), Ex. H.

In some jurisdictions, a suit limitation clause in an insurance policy automatically tolls from the day the insured files a claim until the insurer denies it. *See*, *e.g.*, *Prudential-LMI Comm. Ins. v. Superior Court (Lundberg)*, 798 P.2d 1230, 1242 (Cal. 1990). Neither Washington's courts nor its legislature have adopted this automatic tolling rule. The court declines Bloxom's suggestion that this court adopt the doctrine on Washington's behalf.

Washington courts have, however, applied equitable estoppel to insurance suit limitation clauses. In *Dickson v. United States Fidelity & Guaranty Co.*, 466 P.2d 515, 516 (Wash. 1970), the court considered a one-year suit limitation clause similar to the one in the Policy. The plaintiff suffered a loss in August, promptly made an insurance claim, and received a denial of the claim from the insurer's local agent in October. *Id.* In December, the plaintiff met with the local agent, who agreed that he would ask the insurer's home office to review the claim. *Id.* at 517. The plaintiff received the home office's final rejection of the claim in August of the following year. *Id.* The plaintiff

ORDER – 8

sued in February of the year after that. *Id.* Thus, like Bloxom, the plaintiff in *Dickson* sued outside of his insurance policy's one-year suit limitation clause.

The *Dickson* court held that equitable estoppel prevented the insurer from enforcing the suit limitation clause. It explained as follows:

> The doctrine of equitable estoppel rests on the principle that where a person, by his acts or representations, causes another to change his position or to refrain from performing a necessary act to such person's detriment or prejudice, the person who performs such acts or makes such representations is precluded from asserting the forbearance of the other party to his own advantage.

*Id.*; *see also Logan v. North-West Ins. Co.*, 724 P.2d 1059, 1062 (Wash. Ct. App. 1986) (describing, in a dispute over a suit limitation clause, three elements of equitable estoppel). The court held that while the *Dickson* plaintiff awaited a decision from his insurer's home office, he was excused from complying with the suit limitation clause. 466 P.2d at 517. The court also held that the plaintiff "had a reasonable time after notification of the final denial of liability to commence [its] action." *Id.*

At least one court in this District has applied *Dickson* in denying an insurer's motion for summary judgment on a suit limitation clause. In *Chong v. Safeco Ins. Co.*, No. C05-974RSM, 2006 U.S. Dist. LEXIS 28427, at *15-16 (W.D. Wash. Apr. 27, 2006), the court found estoppel potentially applicable where an insurer repeatedly told its insured that it continued to investigate its claim while simultaneously reserving all rights under its policy. The *Chong* court also cited *David v. Oakland Home Ins. Co.*, 39 P. 443 (Wash. 1895). In *David*, the court held that where the insurer's settlement posture led the insured to believe its claim was still "open for further consideration," the insurer could not rely on its suit limitation clause. *Id.* at 444. Like the *Dickson* court, the *David* court held that the insured had a "reasonable time" after the final rejection of its claim to file a lawsuit. *Id.*

Bloxom presents a more attractive argument for the application of equitable estoppel than the plaintiff in *Dickson*. The *Dickson* plaintiff at least had a preliminary

ORDER – 9

notification from his insurer's local agent that his claim would be denied. Bloxom, by contrast, heard nothing from Fireman's Fund about the denial of its claim until at least February 2010. It sued in September 2010. It might have done so sooner, but for Fireman's July 2010 request that it "hold off on initiating litigation." Under these circumstances, it is possible that equitable estoppel bars Fireman's Fund from relying on its suit limitation clause, and that Bloxom sued within a reasonable time after it learned of the denial of its claim.[5]

Because equitable estoppel provides a sufficient ground for denying summary judgment to Fireman's Fund on the application of the suit limitation clause, the court need not consider whether equitable tolling provides an additional ground. Washington courts regularly apply equitable tolling when parties seek to avoid statutes of limitation. *See*, *e.g.*, *Millay v. Cam*, 955 P.2d 791, 797 (Wash. 1998). The court knows of no Washington court that has applied the doctrine to a contractual limitations period. *But see Reed v. Allstate Ins. Co.*, No. 11-866JLR, 2012 U.S. Dist. LEXIS 19402, at *17-18 (W.D. Wash. Feb. 16, 2012) (applying Washington law and applying equitable tolling to insurance policy suit limitations clause). The court declines to decide, at this time, whether equitable tolling applies in this case.

The court grants Bloxom's motion for reconsideration. There is a genuine issue of material fact over whether Bloxom suffered a loss in the form of the permanent stranding of its shipment of nuts in Venezuela. Most of Fireman's Fund's other efforts to avoid coverage fail as a matter of law. As to Fireman's Fund's claim that Bloxom did not timely sue, disputed facts prevent the court from entering summary judgment in its favor.

---

[5] The court, not a jury, must ultimately decide whether equitable estoppel applies. The court will make that determination after it hears evidence at trial, and may take an advisory verdict on the issue. *See* Fed. R. Civ. P. 39(c).

ORDER – 10

## III. NEW MOTIONS FOR SUMMARY JUDGMENT

The court now turns to the parties' new motions for partial summary judgment. Both motions target Bloxom's extracontractual claims, including its claim for bad faith, for violation of Washington's Insurance Fair Conduct Act ("IFCA") (RCW Ch. 48.30), and for violation of Washington's Consumer Protection Act ("CPA") (RCW Ch. 19.86). Much of Fireman's Fund's motion is, understandably, predicated on the court's ruling that the Policy did not cover Bloxom's loss. To that extent, the motion must fail. Fireman's Fund also asks for a ruling that its claims handling did not violate the law. To that extent, Fireman's Fund's motion is an inverse image of Bloxom's motion, which seeks a ruling that Fireman's Fund's claims handling was, as a matter of law, in bad faith and in violation of IFCA and the CPA. The court begins its analysis of these motions with a review of Fireman's Fund's claims handling.

### A. Fireman's Fund's Handling of Bloxom's Claim

Four parties, not two, handled Bloxom's insurance claim. Fireman's Fund did not issue the Policy to Bloxom; it issued an "open cargo" policy to Universal Freight Forwarders ("UFF"), granting UFF authority to bind others to the Policy by issuing certificates of insurance. Jan. 23, 2012 ord. (Dkt. # 50) at 2. Bloxom is Fireman's Fund's insured because UFF issued it certificates of insurance. *Id.* The Policy designated UFF's insurance broker, Roanoke Trade Services, Inc. ("Roanoke"), as UFF's claims handling agent. Policy ¶ 7.

Antonio Esteves, a Bloxom trader, initially communicated the claim to UFF on May 1, 2009. Clark Decl. (Dkt. # 30) at 70. It appears that UFF did not file a formal claim with Fireman's Fund, but nonetheless received an early indication that Fireman's Fund would not cover the shipment. Clark Decl. (Dkt. # 30) at 75. UFF urged Bloxom to file a claim. *Id.* Shortly thereafter, on June 1, 2009, Mr. Bloxom sent his email advising UFF to add the "dehydration and heat damage" description of the claim. *Id.* at 87. No later than June 4, 2009, UFF forwarded Bloxom's claim to Roanoke. *Id.* at 88.

ORDER – 11

Roanoke promptly communicated the claim to Fireman's Fund; Fireman's Fund promptly assigned an adjuster, Lani Igama. She hired an inspector in Venezuela to investigate. Clark Decl. (Dkt. # 30) at 92. Within a day, the inspector told Ms. Igama that she had discovered the shipment was "waiting for re-export to the USA" and that it could not be inspected in Venezuela. *Id.* at 91. The inspector also offered her coverage opinion: "[I]n my opinion there is no insurance related claim for this shipment, it seems to be a commercial problem between the shipper and the consignee, furthermore we cannot ascertain the condition of the cargo . . . ." *Id.* Ms. Igama notified Roanoke of these developments on June 11, 2009. Ms. Igama stated nothing about whether Fireman's Fund would cover the claim, although she did forward the inspector's coverage opinion. *Id.* at 90. Roanoke responded to her by stating that it would "proceed with [the] matter." *Id.* Ms. Igama somehow interpreted Roanoke's response as an indication that Roanoke would notify Bloxom of Fireman's Fund's coverage determination. Igama Depo. at 85-86.[6] Ms. Igama admits that she does not remember if Roanoke ever told her that it would communicate a coverage decision to Bloxom. *Id.* at 87, 115, 208-09. Roanoke's representative had, however, previously asked that Ms. Igama "work directly with [her]" and promised to "forward any questions/concerns to the assured on your behalf." Clark Decl. (Dkt. # 61) at 35 (Jun. 8, 2009 email). It is not clear whether Roanoke meant Bloxom or UFF when it promised to communicate with "the assured."

On July 9, 2009, Ms. Igama closed the Fireman's Fund claim file. She did so even though she had not communicated with Bloxom, and had made no direct or indirect request that Bloxom provide more information on its claim. Igama Depo. at 103-04. She had not communicated with Roanoke between June 11 and July 9. *Id.* at 126-27. She stated that "arrangement was made to return shipment to USA and from there they can

---

[6] Bloxom's counsel attached Ms. Igama's deposition transcript to one of his declarations. Moore Decl. (Dkt. # 57), Ex. A.

ORDER – 12

file claim if there was damage." Moore Decl. (Dkt. ## 35-36), Ex. E at FF000198. She noted that Fireman's Fund would "reopen [the] file anytime" if an inspection in the United States proved damage to the shipment. *Id.* She admits that her only basis for declining to cover Bloxom's claim was the inspector's opinion that the claim was no more than a commercial dispute. Igama Depo. at 104-06; Moore Decl. (Dkt. ## 35-36), Ex. E at FF000198.

It is undisputed, however, that no one at Fireman's Fund informed Bloxom of Ms. Igama's July 9 decision to close the claim file until much later. Ms. Igama admits that she never communicated with Bloxom, even though she had no indication that Bloxom wanted her to communicate with Roanoke. Igama Depo. at 72-73.

On July 24, 2009, Mr. Esteves asked UFF and Roanoke about the status of Bloxom's claim. Moore Decl. (Dkt. # 45), Ex. D at RTS000150. He apparently received no answer.

So far as the record reveals, no one from Bloxom inquired about the claim again until January 25, 2010, when Mr. Esteves asked both Roanoke and UFF for an update. Clark Decl. (Dkt. # 30) at 100. After consulting with Roanoke, UFF informed Mr. Esteves on January 29, 2010, that Fireman's Fund had closed Bloxom's claim. *Id.* at 98. On February 5, UFF told Mr. Esteves that Fireman's Fund would not cover the claim because it believed the damage was caused by delay. *Id.* at 97. UFF advised him that Bloxom was "free to pursue any legal action." *Id.* Although there is evidence of communication between UFF and Roanoke between January 25 and February 5 (*id.* at 93-95), there is no evidence that anyone attempted to involve Fireman's Fund.

At UFF's request, Roanoke issued UFF a formal letter on February 19, 2010. Moore Decl. (Dkt. # 45), Ex. C. The letter demonstrates that Roanoke understood on June 11, 2009, that Fireman's Fund was unlikely to cover the claim. *Id.* The letter also added Roanoke's conclusion that the loss would have fallen under the Delay Exclusion

ORDER – 13

and that coverage had ceased 60 days after the nuts were offloaded in Venezuela. *Id.*
UFF and Roanoke apparently decided among themselves on the additional reasons to deny coverage. Clark Decl. (Dkt. # 30) at 106. Again, there is no indication that anyone attempted to contact Fireman's Fund. Bloxom knew about the February 19 letter immediately, because Roanoke forwarded it to Bloxom's counsel. Clark Decl. (Dkt. # 30) at 109.

February 2010 marked Bloxom's counsel's first appearance in the claims handling process. Clark Decl. (Dkt. # 30) at 109-10. Fireman's Fund rejoined the process at about the same time. On about February 22, Ms. Igama refused counsel's request to provide Bloxom with a copy of the Policy, contending that she could not do so without UFF's permission. Igama Depo. 175-77; Moore Decl. (Dkt. ## 35-36), Ex. H. Fireman's Fund eventually reopened its claims file on June 17, 2010. Johnson Decl. (Dkt. # 62) ¶¶ 3-4; Igama Depo. at 180-85; Moore Decl. (Dkt. ## 35-36), Ex. E at FF000199. It appointed a new claims adjuster. The new adjuster discussed the claim with Bloxom's counsel, but never suggested Fireman's Fund would cover the claim. As the court noted in Part II, *supra*, the new adjuster requested more information from Bloxom on July 12, 2010 "to properly evaluate the claim and coverage" and asked that Bloxom "hold off on initiating litigation until we see if we can resolve this matter." Moore Decl. (Dkt. # 45), Ex. H. This request marked the end of substantive pre-litigation discussion between the parties. Clark Decl. (Dkt. # 61) at 47. Bloxom filed this lawsuit in September 2010.

**B.**     **Analysis of Parties' Motions for Summary Judgment on Claims Handling**

On a motion for summary judgment, the court must draw all inferences from the admissible evidence in the light most favorable to the non-moving party. *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000). Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party must initially show

the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The opposing party must then show a genuine issue of fact for trial. *Matsushita Elect. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party must present probative evidence to support its claim or defense. *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991). The court defers to neither party in resolving purely legal questions. *See Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 942 (9th Cir. 1999).

Bloxom asserts three extracontractual claims, claiming that Fireman's Fund acted in bad faith and violated IFCA and the CPA. In insurance disputes, an insured's assertion of bad faith against her insurer is a tort claim. *Safeco Ins. Co. of Am. v. Butler*, 823 P.2d 499, 503 (Wash. 1992). A denial of coverage is in bad faith if it is unreasonable, frivolous, or unfounded. *Overton v. Consolidated Ins. Co.*, 38 P.3d 322, 329-30 (Wash. 2002). In considering an insurance claim, an insurer must give equal consideration to the insured's interests and its own interests. *Am. States Ins. Co. v. Symes of Silverdale, Inc.*, 78 P.3d 1266, 1270 (Wash. 2003). The Washington Administrative Code ("WAC") contains The Unfair Claims Settlement Practices Regulation, WAC §§ 284-30-300 to 284-30-450, governing the conduct of insurance companies in handling claims. Violation of those regulations is evidence of bad faith. See *Coventry Assocs. v. Am. States Ins. Co.*, 961 P.2d 933, 935 (Wash. 1998). Because Washington has declared that the insurance business impacts the public interest, an insured establishes a CPA violation when it proves injury to its business or property as a result of an act in bad faith. *See Overton*, 38 P.3d at 330 (citing RCW § 19.86.020); *Kirk v. Mt. Airy Ins. Co.*, 951 P.2d 1124, 1126 (Wash. 1998) ("[T]he business of insurance affects the public interest . . . ."); *see also Indus. Indem. Co. of the N.W. v. Kallevig*, 792 P.2d 520, 530 (Wash. 1990) (holding that a single violation of WAC § 284-30-330 is sufficient to support a CPA violation). Unlike the CPA, IFCA targets the insurance business specifically. Among other things, it gives

ORDER – 15

a cause of action to a first-party insured against an insurer who "unreasonably denie[s] a claim for coverage." RCW § 48.30.015(1). Many violations of the Washington insurance regulations are per se violations of IFCA. RCW § 48.40.015(5) (listing sections of Washington Administrative Code).

There is no question that Fireman's Fund acted in bad faith in its handling of Bloxom's claim. Its bad faith began with its failure to inform Bloxom of the status of its claim. From the receipt of Bloxom's claim in June 2009 until at least February 2010, Bloxom utterly failed to communicate anything to Bloxom. In doing so, it violated numerous regulations. *See*, *e.g.*, WAC § 284-30-380 (requiring prompt notification of the acceptance or denial of a claim, or a prompt notification that the insurer needs additional time to investigate); WAC § 284-30-330(2) (requiring insurer to "affirm or deny coverage of claims within a reasonable time").

Fireman's Fund's only justification for its failure to communicate with its insured is that its claims handler, Ms. Igama, reasonably believed that Roanoke would communicate its position to Bloxom. The court assumes for purposes of this motion that Ms. Igama believed that Roanoke would tell Bloxom that it had closed its claim file without agreeing to cover the claim, and that it would not reopen the claim until Bloxom had returned the nuts to the United States for an inspection. The court further assumes that Ms. Igama's belief was reasonable. These assumptions provide no shelter for Fireman's Fund. An insurer who uses a third party to communicate with its insured does so at its own peril. Roanoke failed to communicate Fireman's Fund's position to Bloxom. The responsibility for that failure falls squarely on Fireman's Fund. If there is any authority for the proposition that an insurer may discharge its basic duty to communicate with an insured by delegating communication to a third party, Fireman's Fund has not cited it, and the court is not aware of it.

ORDER – 16

Although Bloxom contends that Fireman's Fund's bad faith extended beyond its failure to communicate, the court need not resolve those contentions. Bloxom argues, among other things, that Fireman's Fund failed to conduct an adequate investigation and failed to pinpoint its reasons for denying coverage. Bloxom's assertions may be correct, but it suffices for purposes of this order to acknowledge that Fireman's Fund's initial failure to communicate is inextricably tied to its later claims handling. For example, it is possible that if Fireman's Fund had promptly told Bloxom that it was withholding a coverage determination until it could inspect the nuts in the United States, Bloxom might have promptly explained its claim that the nuts were permanently stranded in Venezuela. That in turn might have led Fireman's Fund to promptly accept or deny Bloxom's claim on that basis, or perhaps to investigate whether the nuts were truly stranded. Because Fireman's Fund's later conduct is intertwined with its initial bad faith failure to communicate, there is little value in listing each of Fireman's Fund's potentially bad faith acts. It suffices for now to declare that Fireman's Fund's failure to communicate was bad faith as a matter of law, and to turn to another question: whether Fireman's Fund's bad faith claims handling harmed Bloxom.

It is settled that "a showing of harm is an essential element of an action for bad faith handling of an insurance claim." *Butler*, 823 P.2d 499, 503 (Wash. 1992). In some circumstances, a court must presume harm when an insured proves bad faith. *Id.* at 504. In a first-party insurance case like this one, however, there is no presumption of harm. *Coventry Assocs.*, 961 P.2d at 938. Bloxom thus bears the burden to present evidence of harm. That harm can take the form of expenses it incurred as a direct result of Fireman's Fund's bad faith, consequential damages resulting from a bad faith investigation, or general tort damages. *Id.* at 939-40.

Bloxom articulates only one harm arising from Fireman's Fund's bad faith. It claims that as a result of Fireman's Fund's failure to communicate and its skimpy

ORDER – 17

investigation of Bloxom's claim, Bloxom lost the opportunity to prove its loss. It thus asserts that its damages are about $86,000, the full insured value of its shipment of nuts.

The court rejects, as a matter of law, Bloxom's claim for the full value of its nuts. Fireman's Fund's botched claims handling did not cause $86,000 in damage to Bloxom. Bloxom's insistence that it lost the opportunity to prove its loss is wholly unpersuasive. Bloxom has lost no opportunity, even today. Bloxom was always free to prove that the Policy covered its loss. It did not attempt to do so between the time of its initial claim and February 2010. When Fireman's Fund finally realized that it had closed Bloxom's claim without telling Bloxom, it resumed negotiations with Bloxom. Bloxom was free to prove that its claim was covered, and there is evidence that it attempted to do so. Fireman's Fund refused to pay the claim, but that was because of its interpretation of the Policy, not because of its botched claims handling. It is of course possible that Fireman's Fund's interpretation of the Policy was itself bad faith. But that does not mean that Bloxom lost the opportunity to prove its loss. This lawsuit gives Fireman's Fund yet another opportunity to prove that its claim was covered. There is simply no evidence that Fireman's Fund's non-payment of Bloxom's claim is the result of its botched claims handling.

The court has considered dismissing Bloxom's extracontractual claims because of its failure to articulate a cognizable harm. A bad faith claim requires proof of harm, as does a CPA claim. IFCA permits an insured to cover only "actual damages sustained." RCW § 48.30.015(1). As the court has already noted, however, expenses occurred as a consequence of an insurer's bad faith are a form of harm. Bloxom engaged Dennis Connolly, an insurance industry veteran, to offer expert testimony about Fireman's Fund's claims handling in this case. Mr. Connolly submitted a declaration (Dkt. 56), which attached an expert report declaring that Bloxom is compensating him at the rate of $500 per hour. Although Bloxom did not expressly declare that the cost of engaging Mr.

ORDER – 18

Connolly was a result of Fireman's Fund's bad faith, the record would permit a jury to reach that conclusion. *See Coventry*, 961 P.2d at 939 (listing cost of insurance expert as potential component of damages). Accordingly, the court declines to grant summary judgment against Bloxom's extracontractual claims.

## IV. CONCLUSION

For the reasons stated above, the court GRANTS Bloxom's motion for reconsideration. Dkt. # 52. Bloxom may attempt to prove, at trial, that it suffered the complete loss of its shipment of nuts as a result of their stranding in Venezuela. The court DENIES Fireman's Fund's motion for summary judgment (Dkt. # 53) except that the court rules that Bloxom may not, as a matter of law, argue that Fireman's Fund's bad faith claims handling caused it damage equal to the insured value of its shipment of nuts. The court GRANTS Bloxom's motion for partial summary judgment (Dkt. # 55) in only one respect; the court rules that Fireman's Fund's failure to communicate with Bloxom between June 2009 and February 2010 was bad faith as a matter of law.

Trial in this matter will commence on Monday, May 14, at 9:00 a.m. The court directs the parties to file motions in limine in accordance with Local Rules W.D. Wash. CR 7(d)(4) no later than April 27, 2012. Oppositions will be due no later than May 4, and the parties shall note their motions for that date. The parties shall submit their agreed pretrial order no later than May 9, 2012.

DATED this 19th day of April, 2012.

The Honorable Richard A. Jones
United States District Court Judge

ORDER – 19